IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Leslie R. Gitelman | ) | |
| 2620 Quail Hill Drive | ) | |
| Pittsburgh, Pennsylvania 15241 | ) | |
| Telephone: 412-833-4924 | ) | |
| Email: LRGITELMAN@AOL.COM | ) | |
| PA BAR ID: 61682, Status: Retired | ) | CIVIL CASE NO: 2:21-cv-1696 |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Dawne Wilkinson | ) | |
| 1526 Redfern Drive | ) | **COMPLAINT** |
| Pittsburgh, Pennsylvania 15241 | ) | |
| | ) | |
| DEFENDANT 1 | ) | |
| | ) | |
| The Travelers Companies, Inc. | ) | |
| 485 Lexington Avenue | ) | |
| New York, New York 10017 | ) | |
| | ) | JURY TRIAL: NO |
| DEFENDANT 2 | ) | |
| | ) | |
| Geico Casualty Company | ) | |
| 5260 Western Avenue | ) | |
| Chevy Chase, Maryland 20815 | ) | |
| | ) | |
| DEFENDANT 3 | ) | |
| _____ | ) | |

**TABLE OF CONTENTS**

**Complaint**

Page

Introduction                                                                                    1

Construction and Presentation of Exhibits A-W Attached Hereto                                    1

A.    Parties to this Complaint, Jurisdiction, and Applicable Law

    1.    Plaintiff                                                                            2

    2.    Defendants                                                                           2

    3.    Jurisdiction

        a.    Diversity                                                              3

        b.    Amount in Question                                                     3

        c.    Applicable Law                                                         3

B.    Parties, Concepts, Factual History, and Statement of Complaint

    1.    Identification and Relationships of Parties and Concepts                             3

    2.    Factual History                                                                     10

    3.    Statement of Complaint                                                              28

C.    Issues and Attendant Criminal Theories Identified in the Matter

Issues

    1.    Kontos's December 2 solicitation violated Rule 217
        of the Pa.R.D.E.                                                                    31

    2.    The P.O.A. in the Solicitation Documents is not legally crafted
        valid, or enforceable.                                                              32

    3.    Collura's filing of the Petition violated the scheduling requirements
        in the Pa.R.C.P. and the Allegheny County Local Rules.                              32

    4.    The W.J.F. Alias used by Travelers is an unregistered trade
        name in Pennsylvania.                                                               35

    5.    Judge Della Vecchia's October 23, 2020 scheduling order
        violated the discovery scheduling process.                                          37

6.   Collura's intentional concealment of the October 2, 2020        39
     Letter during discovery is suspicious, goes to consciousness of
     impropriety, and possible knowledge of and participation in the Fraud
     Scheme.

7.   Collura's including the Deposition Transcript in the Trial Court      40
     Record violated Rule 4002.1 of the Pa.R.C.P. governing the filing of
     discovery documents in the D.C.R.

8.   White's failing to file the Kontos Petitions in the D.C.R. is         40
     suspicious and procedurally questionable.

9.   Collura and Kontos's prior working relationship is at the heart       41
     of the Petition and Travelers is accountable for it.  Without
     Collura's filing of the Petition, the Fraud Scheme wouldn't be possible.

10.  Collura and Scott's actions violate the Travelers Code of Conduct     43
     in eight different ways and these violations helped make the Fraud
     Scheme possible.

11.  K&M Law Group's Referral Fee payments violate Pa.R.P.C.              48
     Rule 7.2 Advertising (c).

12.  Summary Analysis of Issues 1-11.                                      50

                          Attendant Criminal Theories

1.   Insurance Fraud, 18 U.S.C.§ 1033 and 18 Pa. C.S.A. § 4117.          52

2.   Forgery, 18 U.S.C. Chapter 25, Counterfeiting and Forgery,           53
     generally, and 18 Pa. C.S.A. § 4101.

3.   Bank Fraud, 18 U.S.C. § 1344 and 18 Pa. C.S.A.,                      54
     Chapter 41, generally.

4.   Tax Fraud, 26 U.S.C. § 7201 and 61 Pa. C.S.A. § 119.22.             54

5.   Mail and Wire Fraud, 18 U.S.C.§ 1341 and 18 U.S.C.§ 1343.          55

6.   Attempt and Conspiracy, 18 U.S.C. § 1349 and                        55
     18 Pa. C.S.A. §901-903.

D.   Conclusion                                                           56

E.   Relief Sought                                                        57

F.   Certificate of Service                                               58

**Exhibits**

Ex. Page

A.   Travelers Documents                                                          1

B.   Geico Documents                                                             17

C.   Wilkinson v. Gitelman - Petition - GD-20-011007                            29

D.   Annotated Police Report from U.S.C. Police Department                      46

E.   Kontos Recommendation from Eric Pfeil                                       52

F.   Solicitation Documents                                                     55

G.   Gitelman/Kontos Email Messages                                            68

H.   August 3, 2020 Termination Notices to Kontos                              95

I.   Gitelman/Scott Email Messages                                            116

J.   Gitelman's October 2, 2020 Letter                                        121

K.   October 23, 2020 Scheduling Order from Judge Della Vecchia                130

L.   Kontos Deposition Documents                                              132

M.   July 12, 2021 Order of Court                                             170

N.   Recorded July 12, 2021 Order of Court                                    175

O.   Travelers Payment to Gitelman                                            178

P.   Payment of Referral Fees                                                 184

Q.   Annotated Trial Court Opinion                                            216

R.   Medical Opinions                                                         228

S.   Analysis of Rule 217 Violations                                         234

T.   Analysis of P.O.A. and K.M.K.H. Entity                                   313

U.   W.J.F. Alias                                                             394

V.   Collura/Kontos Prior Working Relationship                                420

W.   Travelers Code of Conduct                                                443

iii

## Complaint

**Introduction**: I, Leslie R. Gitelman ("Plaintiff"), on my own behalf and representing myself pro se, hereby make and file this complaint (the "Complaint") in the United States District Court for the Western District of Pennsylvania (the "District Court").  The jurisdiction for this Complaint is diversity of citizenship ("Diversity") pursuant to 28 U.S.C. § 1332, with the amount in question being greater than $150,000 and the defendants being: (i) a natural person residing in the Township of Upper Saint Clair, Allegheny County, Pennsylvania, (ii) The Travelers Companies, Inc., a Minnesota corporation headquartered in New York, and (iii) Geico Casualty Company, a wholly-owned subsidiary corporation of Berkshire Hathaway, Inc., a Delaware corporation headquartered in Omaha, Nebraska.

**Construction and Presentation of Exhibits A-W Attached Hereto**: The exhibits A-W attached hereto total 463 pages and each page is numbered individually in the upper right corner, formatted: "Gitelman Complaint, Exhibits, Ex. [Page Number]" (the "Exhibits," abbreviated: "Ex."). This page number format supersedes all other page numbers which may appear on any given page and the exhibit page numbers referenced in this Complaint will refer to this exhibit page number.  The Adobe Portable Document Format ("P.D.F.") file version of this Complaint has the page numbers for the exhibits coded as: "Ex. [Page Number]" in the navigation window.  Bookmarks have been inserted in the P.D.F. which will bring a reader directly to the cover page of each exhibit.  The table of contents at the beginning of this Complaint presents the title of each exhibit and the cover page number where each exhibit begins within the Exhibits.

1

**Parties to this Complaint, Jurisdiction, and Applicable Law**

1.      Parties to this Complaint: The parties to this Complaint are:

A.      Plaintiff: Leslie R. Gitelman, a natural person and resident of
Allegheny County, Pennsylvania, residing at: 2620 Quail Hill Drive,
Pittsburgh, Pennsylvania 15241; telephone number: 412-833-4924,
email address: LRGITELMAN@AOL.COM;

B.      Defendant 1: Dawne Wilkinson ("Wilkinson"), a natural person and
resident of Allegheny County, Pennsylvania, residing at: 1526
Redfern Drive, Pittsburgh, Pennsylvania 15241-2957; telephone
number: unknown; email address: unknown[1];

C.      Defendant 2: The Travelers Companies, Inc. ("Travelers"), a
Minnesota corporation, headquartered at: 485 Lexington Avenue,
New York, New York 10017; telephone number: 917-778-6000;
email address: unknown[2]; the senior corporate officer of Travelers
is: Alan D. Schnitzer ("Schnitzer"), Chairman of the Board of
Directors and Chief Executive Officer[3]; and

D.      Defendant 3: Geico Casualty Company, a Maryland corporation,
headquartered at: 5260 Western Avenue, Chevy Chase, Maryland
20815; telephone number: 800-841-3000; email address:

---

[1]  Ex. pgs. 2-4.

[2]  Ex. pg. 11, note E.

[3]  Ex. pg. 15, note G.

2

E.      unknown[4]; the senior corporate officer of Geico is: Todd Combs, President and CEO.[5]

2.      Jurisdiction: The District Court has jurisdiction over this Complaint based on (i) Diversity, and (ii) the amount in question.

A.      Diversity: This element of jurisdiction is established because I, as plaintiff, am a resident of Allegheny County, Pennsylvania. Wilkinson as Defendant 1 is a resident of Allegheny County, Pennsylvania.  Travelers as Defendant 2 is a Minnesota corporation.  Geico as Defendant 3 is a Maryland corporation.

B.      Amount in Question: The amount in question is between $150,000 and $1.1 million, not counting interest and costs of court; these amounts will be detailed later in this Complaint.

3.      Applicable Law: The applicable law in this Complaint is Pennsylvania Code Title 75, Chapter 17, the Motor Vehicle Financial Responsibility Law (the "M.V.F.R.L.").[6]

**Parties, Concepts, Factual History, and Statement of Complaint**

4.      Identification and Relationships of Parties and Concepts: In this Complaint I will be referring to the following parties (the "Parties") and concepts (the "Concepts") defined in the following paragraphs five to 31.

---

[4]  Ex. pg. 27, note E.

[5]  Ex. pg. 26, note D.

[6]  See: 75 Pa.C.S. §1701, *et seq.*

3

5.      "Wilkinson" is Defendant 1 in this Complaint, but also was the driver of a 2011 Cadillac SRX performance sport utility vehicle (the "Vehicle") that struck me on November 26, 2019 at approximately 3:50 P.M. while I was walking along Redfern Drive in the Deerfield Manor neighborhood located in the Township of Upper Saint Clair ("U.S.C."), in Allegheny County, Pennsylvania (the "Motor Vehicle Accident" or "M.V.A.," or "MVA"). The vehicle identification number ("VIN") for the Vehicle is 3GYFNBEY8BS540191.[7]

6.      "Travelers" is Defendant 2 in this Complaint, but also is the insurance company that wrote and carries the automobile insurance policy purchased by Wilkinson in effect during the M.V.A.[8] The last four digits of the applicable Travelers insurance policy is: 2031 and Wilkinson's Travelers account number is: 3663; the effective dates of the Travelers insurance policy are: "March 15, 2019 to March 15, 2020 12:01 A.M. Standard Time" (the "Travelers Policy")[9].  Because I was hit by Wilkinson while walking, I'm a third party claimant and have a bodily injury claim against Travelers based on the terms of the Travelers Policy and the M.V.F.R.L.  The "Bodily Injury and Property Damage" limit of the Travelers Policy is "$500,000 each accident."[10] The number assigned by Travelers to my claim is: IEZ7845 (the "Travelers Claim"). Throughout this Complaint, I will be referring to "Wilkinson" when describing the events

---

[7]  Ex. pgs. 2 and 4.

[8]  Ex. pgs. 2, 4, 7, and 9.

[9]  Ex. pg. 7, at: "1. Named Insured" and "2. Premium."

[10]  Id. at Note C.

4

of the M.V.A. and "Travelers" or the "Travelers Policy" for all other purposes because the Travelers Policy covers Wilkinson and Travelers is the corporate entity that would pay my Travelers Claim against Wilkinson as driver of the Vehicle on November 26, 2019, the date of the M.V.A.

7.       "Geico" is Defendant 3 in this Complaint, but also is the insurance company that wrote and carries the automobile insurance policy purchased by me in effect during the M.V.A.[11] The last four digits of the applicable Geico insurance policy is: 2002; the effective dates of the Geico insurance policy are: "Effective Date: July 26 [and] Expiration Date: January 26, 2020" (the "Geico Policy").[12]  The Geico policy provides for "Underinsured Motorist/With Stacking Each Person/Each Occurrence" of "$300,000/$300,000."[13]  Because the Geico Policy provides for "Stacking," the value of the benefit provided by Geico in an "Underinsured Motorist" situation is twice the stated "$300,000," or a total of $600,000 per person, per occurrence for the M.V.A.

8.       "Total Coverages Limit" is the sum of the $500,000 in coverage provided by the Travelers Policy, plus the $600,000 in coverage provided by the Geico Policy, or $1,100,000 in total available insurance coverage for the harm I received from the M.V.A.

---

[11] Ex. 18, Note A.

[12] Id.

[13] Ex. 19, Note B.

5

9.      "Scott" is Mark W. Scott, a "Claim Professional, Auto Liability," for Travelers in its Mid-Atlantic Claim Center, P.O. Box 430, Buffalo, New York, 14240-0430.

10.     "K&M Law Group" is a Pennsylvania professional corporation (Entity Number: 4228519, Citizenship: Domestic, Address: Two Gateway Center, 12th Floor, North Wing, Pittsburgh, Pennsylvania 15222.  Incorporation Date: November 20, 2013). K&M Law Group was formed by George Michael Kontos, Esq. and Anthony C. Mengine, Esq.  The last four digits of the federal tax id number of K&M Law Group is: 0437.  K&M Law Group is also known as:

A.      "Kontos Mengine Killion & Hassen" or "KMKH" or "K.M.K.H.";

B.      "The Kontos Law Group" or "KLG" or "K.L.G."; and

C.      "Kontos Killion & Hassen" or "KKH" or "K.K.H."

11.     "Kontos" is George Michael Kontos, Esq., a Pennsylvania attorney, ID: 62712, admitted: 11/26/1991.  Kontos is employed by and a shareholder in K&M Law Group.

12.     "Mengine" is Anthony Charles Mengine, Esq., a Pennsylvania attorney, ID: 63209, admitted: 12/16/1991. Mengine is employed by and a shareholder in K&M Law Group.

13.     "Killion" is Katie Adams Killion, Esq., a Pennsylvania attorney, ID: 205203, admitted: 4/24/2007.  Killion is employed by K&M Law Group.

14.     "Hassen" is Brittani Rae Hassen, Esq., a Pennsylvania attorney, ID: 309492, admitted: 10/14/2010.  Hassen is employed by K&M Law Group.

15.     "Webb" is Benjamin Donald Webb, Esq., a Pennsylvania attorney, ID: 328170, admitted: 1/14/2020.  Webb is employed by K&M Law Group.

16.     "Collura" is Elizabeth Farina Collura, Esq., a Pennsylvania attorney, ID: 206197, admitted: 10/11/2007.  Collura is employed by Travelers as a senior counsel in Pittsburgh, Pennsylvania.  Collura's publicly available Pennsylvania bar information states that she is employed by: William J. Ferren & Associates, 112 Washington Plaza, Suite 975, Pittsburgh, Pennsylvania 15219 ("W.J.F.").  This W.J.F. affiliation is not consistent with information Collura presented to me following the M.V.A.

17.     "White" is David Benson White, Esq., a Pennsylvania attorney, ID:36684, admitted: 10/18/1982.  White is employed by Burns White LLC ("Burns White"), located at: Burns White Center, 48 26th Street, Pittsburgh, Pittsburgh 15222.

18.     "Pfeil" is Charles Eric Pfeil, Esq., a Pennsylvania attorney, ID: 44848; admitted: 11/20/1985.  Pfeil is employed by Dentons Cohen & Grigsby P.C., 625 Liberty Avenue, 5th Floor, Pittsburgh, Pennsylvania 15222-3152 ("D.C.G.").  At the time of the M.V.A., Pfeil was handling an estate planning matter for me.  In response to an emailed request for "...an internal...referral to a personal injury attorney...," Pfeil provided Kontos's name and contact information with the recommendation that "...[Kontos] is our go-to person" for personal injury representation.

19.     "Judge Della Vecchia" is Judge Michael A. Della Vecchia, a Pennsylvania attorney, ID: 9949; admitted: 10/29/1971. Judge Della Vecchia sits on the Court of Common Pleas, Allegheny County, Civil Division in the Pennsylvania Fifth Judicial District, 710 City-County Building, 414 Grant Street, Pittsburgh, Pennsylvania 15219 (the "Court" or "Trial Court").

20.     "Mengine Report" is the "Report and Recommendations of The Disciplinary Board of the Supreme Court of Pennsylvania," dated September 24, 2019, docket number: 66 DB 2017.  The "Mengine Report" was written about Mengine's actions that violated the Pennsylvania Rules of Professional Conduct for attorneys practicing in Pennsylvania (the "Pa.R.P.C.").

21.     "Petition" or "Matter" is the civil Petition to Enforce Settlement filed against me on October 22, 2020 by Collura, representing Travelers.  The Petition was assigned to Judge Della Vecchia and docketed as: GD-20-011007 on October 23, 2020.[14]  I never filed a counterclaim in the Matter and defended myself pro se against the Petition.

22.     "W.J.F. Alias" refers to the law firm alias of "William J. Ferren & Associates, P.O. Box 2903, Hartford, Connecticut 06104-2903, telephone: 412-338-3034.  The W.J.F. Alias was used by Collura to file the Petition and pursue the Matter against me in Court before Judge Della Vecchia.[15]  Throughout the Matter, Collura used the W.J.F. Alias from her "ECollura@Travelers.com" email address. Collura was aided in the filing and distribution of pleadings in the Matter by Renee A. Vano, a legal secretary employed by Travelers ("Vano").[16]  Vano's email address in the Matter is: RVano@Travelers.com.[17]

_____

[14]  Ex. pgs. 29-45.

[15]  Id. pgs. 30 Note A, 31 Note B, 32 Notes C and D, 33 Notes E and F, 35 Note G, 40 Note K, and 44 Note L.

[16]  Id. pgs. 30 Note A and 32 Note C.

[17]  Id.

23.     "Deposition" refers to the transcript of the December 17, 2020 deposition of Kontos by Collura in the Matter.  On January 27, 2021, Collura filed the entire Deposition with the Court as an attachment to her brief.  Because Collura filed the Deposition with the Court, it's a public record and will be quoted from in this Complaint and the attached Exhibits.  Pages in the Deposition are numbered 1-51 and references in this Complaint will be to those page numbers.

24.     "Hearing" refers to the March 17, 2021 hearing by the Court in the Matter. The Hearing transcript is a 94-page P.D.F.; references in this Complaint will be to these pages 1-94 (the "Transcript").

25.     "Order" refers to the July 12, 2021 Order of Court issued by Judge Della Vecchia in the Matter.[18]

26.     "Superior Court" refers to the Superior Court of Pennsylvania, Western District, 310 Grant Street, Suite 600, Pittsburgh, Pennsylvania 15219-2297, telephone: 412-565-7592, Prothonotary: Joseph D. Seletyn, Esq., Bobbi Jo Wagner, Deputy Prothonotary.

27.     "Appeal" refers to my July 28, 2021 Notice of Appeal to the Superior Court in the Matter (the "Notice of Appeal").  On August 4, 2021, the Superior Court docketed the Appeal as: 876 WDA 2021.

28.     "Trial Court Opinion" or "T.C.O." refers to the September 2, 2021 opinion in the Matter authored and signed by Judge Della Vecchia.[19]

---

[18]  Ex. pgs. 171-173.

[19]  Ex. pgs. 216-227.

29.    "Trial Court Record" or "T.C.R." refers to the 41 documents that have been integrated into a single P.D.F. file containing 978 pages and transferred from the Court to the Superior Court as part of the Appeal.  Some pages from the T.C.R. may be referenced in this Complaint by the page numbers 1-978.

30.    "Appeal Brief" refers to my October 13, 2021 Brief for Appellant filed with the Superior Court.

31.    "Reply Brief(s)" refers to the reply to my Appeal Brief that is scheduled for filing by Travelers and Kontos with the Superior Court on or before December 13, 2021.

## Factual History

32.    At 3:50 P.M. on November 26, 2019, and less than 150 feet from the front yard of her home, Wilkinson hit me with her Vehicle while I was walking along Redfern Drive ("Redfern") in Allegheny County ("M.V.A.").  The M.V.A. occurred on dry streets, in broad daylight with clear visibility, while I was walking against traffic with my fiancé Mike Buckler ("Mike") and our dog, Max.[20]  Earlier that day, I had been finalizing the preparations for a replacement surgery of my right hip because I have advanced degenerative arthritis in that joint.  Beginning on August 12, I had spent months preparing for the procedure, which I was cleared and scheduled to have on December 4.  With the weather being as nice as it was, Mike and I decided to take a walk in our neighborhood.  Moments before the M.V.A., Mike was walking to my left, holding Max's leash.  Wilkinson's Vehicle left the roadway, struck me head-on and continued moving with me on the hood.  The Vehicle missed Mike and Max by approximately 12-18".  In

---

[20]   T.C.R. pages 16-87, which is my Answer in the Matter.

addition to Mike, the M.V.A. was witnessed by individuals nearby.  Police and paramedics were summoned, I was transported by ambulance to UPMC Presbyterian Hospital ("Presby"), and the police cited Wilkinson for violating "3714A - Careless Driving-General."[21]  At Presby, my work-up revealed, *inter alia*: (i) a severely broken left humerus, in three pieces, (ii) fractures to my pelvis and lower back vertebrae, (iii) cuts, bruises, and abrasions on my face, arms, and hands; and (iv) cuts inside my mouth.  I spent the night in the trauma unit and was released on November 27, in tremendous pain and unable to walk.

33.     On December 2, Kontos visited Mike and me in our home.  Kontos was referred in writing by C. Eric Pfeil, Esq. ("Pfeil"), a Pittsburgh-based trusts and estate attorney.  Mike and I discussed the facts of the M.V.A. with Kontos and he presented documents for me to sign if I wanted to retain him and K.M.K.H. ("Solicitation Documents").  All of the Solicitation Documents were either on K.M.K.H. letterhead or referenced K.M.K.H. directly.  Included with the Solicitation Documents was a one-page "Power of Attorney/Fee Agreement," ("P.O.A."), specifying the contingency fee due to K.M.K.H. for representing me.

34.     On December 3, I executed the Solicitation Documents, returning them via Federal Express.  With that, Kontos and K.M.K.H. began representing me.[22]  By late December, the email address that Kontos was using had changed and the name

---

[21]  Id. The Annotated Police Report for the M.V.A. is T.C.R. pages 45-49.  Ex. pgs. 46-51.

[22]  T.C.R. pages 55-60 for the signed Solicitation Documents.  The Solicitation Documents are also Ex. pgs. 55-67.

"Mengine" had been removed from the K.M.K.H. name.  At the time, I didn't research it and Kontos never explained it.

35.     By late July 2020, the contours of a settlement with Travelers appeared to be in focus.  Since December 3, Mike and I had spoken with Kontos and Ben Webb, an associate at K.M.K.H., via telephone three times: (i) March 4, 2020 at 3:30 P.M., (ii) April 28 at 4:00 P.M., and (iii) June 18 at 10:30 A.M.[23]  The calls were general and perfunctory, with Kontos never explaining how my claim would be settled or the mechanics of the settlement process.  On July 2, Kontos emailed me an update by writing following "some back and forth with [Scott]..." and after a "committee" review, the "drop dead" value of my claim was $150,000.[24]  Kontos wrote that he would typically call to deliver the news, but he felt that he and I had already talked "a number of times" and I was "well aware of the pros/cons."[25]  On July 9, I emailed Kontos authorizing him to ask Scott to increase the settlement value to $200,000.[26]  I never received a reply from Kontos.[27]  On July 23, I received an email from Kontos stating "$150,000 is the final offer" and if I wanted to go to court, it could take years before my case was heard, which meant settling at $150,000 was probably the better option.[28]

---

[23]  T.C.R. pages 862-936, generally, and 879-887 for time line.

[24]  T.C.R. page 911.  Ex. pg. 69, para. 2.

[25]  Id., para. 5.

[26]  T.C.R. page 914. Ex. pg. 72, para. 1.

[27]  Id.

[28]  T.C.R. page 919.  Ex. pg. 77, para. 1.

36.     On July 29 at 11:39 A.M., I emailed Kontos making clear that while I was "disappointed" in the offer, I would "accept the $150,000" rather than take my chances at trial in a couple of years.[29]  At the time, I expected I would need to sign some type of settlement document, but I'd never seen one and expected Kontos to offer me his legal advice and counsel.  I also wrote: "I'm assuming the funds will be wired to me and that I'll provide the wiring instructions with the settlement agreement."[30] At 12:00 P.M. on July 29, Kontos emailed Scott advising him I had accepted the $150,000 and requesting a "release."  In that same message, 21 minutes after notifying Kontos I expected the funds to be "wired" to me, Kontos instead wrote to Scott that Travelers should send a check made "payable" to "Leslie Gitelman, and Kontos Killion &Hassen [sic];" adding: "Please send the check to my attention, at my home address."[31]  Literally, one minute later, Kontos emailed me: "I think it's the right call, taking everything into consideration. I will relay this, and will start the process."[32]  At 2:22 P.M., Kontos forwarded the message Scott sent at 1:34 P.M.  That message from Scott included the "Draft Release" as an attachment ("Draft Release"), with Scott noting: "Please return the executed release and I will send you the settlement check."[33]  Kontos's 2:22 P.M. message states:

---

[29]  T.C.R. page 920.  Ex. 77, para. 4.

[30]  Ex. pg. 78, para. 5.

[31]  T.C.R. pages 921-923. Ex. pg. 79.

[32]  Ex. pg. 80.

[33]  T.C.R. pages 928-932.  Ex. pg. 86.

"Leslie, please see attached [Referring to Scott's Draft Release].  Please execute and send back.  As noted, it does not need to be notarized.  Call me if you have any questions."[34]

After reading the Draft Release and rereading Kontos's email messages, I sent Kontos an email at 5:27 P.M. that: (i) objected to the language in the Draft Release, (ii) requested the settlement funds be wired to me and that I wire Kontos's fee to him, and (iii) asked about the signature requirement on the Draft Release.[35]  I also requested a telephone call the following day "between 1:30 P.M. and 3:30 P.M.," noting that Mike would be participating.[36]

37.    On July 30 at 10:31 A.M., Kontos, without answering my questions, sent me an email, writing: "I have a very busy day Leslie.  I will try to call you to discuss.  If not, lets [sic] talk tomorrow.  Thx."[37]  At 4:30 P.M. on the 30th, Kontos left a voicemail noting he thought I made the right decision about the settlement, but again neglecting to answer my questions.[38]

38.    Throughout July 31, I thought about my situation.  I didn't understand why Kontos hadn't addressed my objections to the Draft Release and why he would write to Scott that he wanted the settlement funds sent to him by check, when I specifically told Kontos twice in writing that I expected the funds to be "wired" to me.[39]  I began to have

---

[34]  Id.

[35]  Ex. pg. 90.

[36]  Id.

[37]  T.C.R. page 933. Ex. pg. 91.

[38]  Kontos left his voicemail at my home telephone number.

[39]  Ex. pgs. 78 and 90.

serious concerns about Kontos's obvious evasiveness and repeated unresponsiveness. Shortly before 5:00 P.M., it occurred to me that I never researched what happened to the "Mengine" in K.M.K.H.  At 5:00 P.M., I typed "Anthony C. Mengine" into Google.com and learned that on November 26, 2019, Mengine had been suspended from practicing law by The Disciplinary Board of the Supreme Court of Pennsylvania (the "Board") because of a pattern of misappropriating client funds ("Mengine Report").[40]  With that revelation, I concluded Kontos should be fired and I would need to review everything associated with my Travelers Claim (the "Review").  Had I known Kontos was practicing law with a suspended attorney, I wouldn't have retained Kontos or K.M.K.H.  Yet, when Kontos met with me on December 2, 2019, he never mentioned the situation with Mengine, or that Mengine had been suspended the same day as my M.V.A.   In an emailed and faxed termination notice ("Termination Notice"), I fired Kontos on August 3, 2020 at 9:15 A.M. ("Effective Date").[41]

39.     As of the Effective Date, four things were certain: (i) on July 29, Kontos directly contradicted my twice written instructions to him that I wanted the settlement funds "wired" to me and I wanted to settle his fee via a wire transfer to him; (ii) I objected to the language in the Draft Release, but Scott didn't know that; (iii) I hadn't signed the Draft Release and no money had changed hands; and (iv) in the December 2, 2019 conversation with Mike and me, Kontos withheld information about the Mengine Report.

_____

[40]  T.C.R. pages 435-503.  Locate: Mengine Report at internet uniform resource locator: https://www.padisciplinaryboard.org/for-the-public/find-attorney/attorney-detail/63209

[41]  T.C.R. pages 51-63. Ex. pgs. 92-105.

40.     Shortly after the Termination Notice, I emailed Scott, explaining my

Review, noting I would be back in touch with him by 5:00 P.M. on September 2, 2020.[42]

By late August, the Review was delayed by the Covid-19 crisis.  I emailed Scott on

August 27 at 2:23 P.M. extending the Review.  He replied:[43]

> "I can certainly grant you this courtesy.  However, if this is not resolved by the
> time frame given, I will be forwarding this to counsel to file a petition to enforce.
> Thank you."[44]

And with Scott's August 27 message, Travelers threatened me in writing.  The

implication was clear: if I didn't sign the Draft Release, I was going to be sued by

Travelers.[45]

41.     By October 2, my Review was complete and I notified Scott of my findings

in a six-page letter ("October 2, 2020 Letter"), writing that I'd been:

> "...able to establish what information Kontos was given about my case [from
> UPMC]."[46]  Based on that information, I believed Kontos had given Travelers
> "...incomplete facts about my medical prognosis and what my current situation
> [was]."[47] [Continuing:] "...[I]f the information that Travelers has is incomplete, then
> it's not a full understanding of my case.  Legally defined, acting on incomplete
> representations is the same as acting on misrepresentations.  At this point, it's
> important to recognize that my Claim hasn't yet been settled, no release
> agreement has been executed, and no money has changed hands."[48]

---

[42]  T.C.R. pages 65-69. Ex. pgs. 109-111.

[43]  T.C.R. pages 77-78.  Ex. pgs. 119-120.

[44]  Id.

[45]  Id.

[46]  T.C.R. pages 80-87.  Ex. pgs. 121–129, specifically, pg. 125, paras. 5-6.

[47]  Id.

[48]  Id.

42.     As of October 2, and based on the information I had at that time, it appeared as though Kontos was engaged in a conspiracy to commit insurance fraud.[49] As of July 29, he'd already provided me with written proof he had no intention of having Travelers transfer the settlement proceeds to me.  Yet after my Review, I could prove Kontos gave Travelers inaccurate and incomplete information about my medical prognosis.  With my October 2, 2020 Letter, I asked for Travelers assistance with resolving my claim.[50]  Instead, Collura had me served on October 22 with the Petition.

43.     Understanding the seriousness of the situation, I drafted and filed my Answer on October 29.  After that, the Matter went through discovery.  Therein, Collura withheld production of the October 2, 2020 Letter, which I compelled her to disclose and following the Trial Court's order to do so, she sent it.[51]  Briefs in support and opposition to the Petition were filed on January 27, 2021.  On January 26, Kontos's attorney David B. White ("White") served me via email with a (i) petition to intervene and (ii) a petition for specific performance of power of attorney/fee agreement (the "Kontos Petitions").[52] White didn't file the Kontos Petitions in the Allegheny County Department of Court Records ("D.C.R."), but the Trial Court approved them anyway with

---

[49]  Id.  See: Insurance Fraud, 18 United States Code ("U.S.C.") § 1033 and 18 Pennsylvania Consolidated Statutes ("Pa.C.S.A.") § 4117.  See also: Mail and Wire Fraud, 18 U.S.C.§ 1341 and 18 U.S.C.§ 1343 and Attempt and Conspiracy, 18 U.S.C.§1349 and Pa.C.S.A. §901-903.

[50]  Ex. pgs. 124-129, generally.

[51]  T.C.R. page 548.

[52]  The Kontos Petitions appear at Ex. pgs. 344-352.

an order of court dated January 29.[53]  Undeterred, I filed my answer to the Kontos

Petitions in the D.C.R. on February 4, but the Trial Court failed to consider it because

the Kontos Petitions were approved 72 hours after White emailed them.[54]  With the

Kontos Petitions missing from the D.C.R., White filed them again on February 26.[55]  The

Trial Court approved them a second time, in this instance, literally the same day White

filed them.[56]  Again undeterred, I filed my second answer to the Kontos Petitions in the

D.C.R. on March 1, but again, the Trial Court never considered it.[57]

44.     During the Matter, I learned Collura's first job after finishing law school

was as an associate with Swensen, Perer & Kontos ("S.P.K.").[58]  At the time, S.P.K.

employed 7 attorneys and Collura worked there from August 2007 to December 2010.[59]

Kontos was a named partner at S.P.K. before leaving to start the K&M Law Group.  I

also learned Collura's filing of the Petition violated the Travelers Code of Conduct

("Code of Conduct"), which is publicly available on Travelers.com.[60]  When I summoned

---

[53]  T.C.R. page 549.

[54]  T.C.R. pages 551-596.

[55]  T.C.R. pages 646-661.

[56]  T.C.R. page 645.

[57]  T.C.R. pages 662-713.

[58]  T.C.R. pages 526-547.  Ex. pgs. 421-442, generally, and pg. 423, Note C, where Collura's LinkedIn profile states that she was employed as an "attorney" for "Swensen Perer & Kontos" between August 2007 and December 2010, or "3 years and 5 months."

[59]  Ex. pgs. 431-442.

[60]  T.C.R. pages 505-523. Ex. pgs. 443-460.

Avrohom J. Kess, Esq., Travelers's Vice Chairman and Chief Legal Officer ("Kess"), and Rachel S. O'Neill, Esq., Travelers's Chief Ethics and Compliance Officer ("O'Neill") to the Hearing, so they could testify via teleconference about whether Collura's Petition complied with the Code of Conduct or whether her concealing the October 2, 2020 Letter during discovery was compliant, Collura moved to strike Kess and O'Neill from my witness list.[61]  The Trial Court apparently didn't want to hear from Kess or O'Neill, because at the Hearing it granted Collura's motion to strike.[62]  Uninterested in what Mengine had to say about the Solicitation Documents being presented to me after he had been suspended by the Board, the Trial Court also granted White's motion to strike Mengine from my witness list.[63]

45.     Following the Hearing, post-hearing briefs were due and filed on April 2, the Good Friday holiday.  As Judge Della Vecchia stated at the Hearing:

> "After I get the briefs, I will enter the decision promptly.  And they don't mail anything out, I don't think.  So it will be on-line for your review.  Okay. Thank you very much."[64]

46.     Following the Hearing, week after week went by and there was no "decision" from the Court.  I checked the D.C.R. daily and after 30, 60, then 90 days, I started to have concerns about the delayed decision in the Matter.  Then, at 12:36 P.M. on July 12, 101 days after filing the post-hearing briefs, Collura sent an email message

---

[61]  T.C.R. pages 629-635.

[62]  T.C.R. page 847.

[63]  Transcript page 34, line 12-15.

[64]  Transcript pg. 93, lines 3-7.

with the subject line: "Wilkinson v. Gitelman- Order on Petition to Enforce Settlement."[65] Attached to the message was the Order, dated "April 8, 2021," but the Order hadn't been recorded in the D.C.R. because there was no docket number written in the caption.[66] From this Order, it can be concluded that Judge Della Vecchia handed the Order to Collura in court and instead of ensuring it was properly recorded in the D.C.R., Collura simply emailed it.[67] At 1:11 P.M., White sent an email requesting "...Travelers to issue and send to Ms. Gitelman and Attorney Kontos their respective checks."[68] Later that week, I received via the U.S. Mail the properly recorded Order with the Matter's docket number written in the caption where it should have been on July 12.[69]

47.    The same week via the U.S. Mail, I received Travelers check number "883H   29505766," dated July 12, 2021, made payable to me in the amount of: $100,422.47.[70] I never deposited the check and still have it in my custody (the "Settlement Check"). From the Settlement Check, it can be reasonably concluded that Collura authorized the distribution of $150,000 in Travelers monies to Kontos and me based on an improperly recorded Order from the Court that had never been filed in the D.C.R.

---

[65] Ex. pgs. 171-173.

[66] Ex. pg. 173.

[67] Id.

[68] Ex. pg. 174.

[69] Ex. pgs. 176-177.

[70] Ex. pgs. 180-183.

48.     At 11:00 A.M., on July 26, I was shocked to receive an email from Pfeil

notifying me "...that [Kontos] was sending a check to [D.C.G.] for a referral fee."[71]  As

Pfeil explained in his email:

>  "There was never any expectation on my part that [D.C.G.] would receive a
> referral fee.  My thought is that I will call [Kontos] and tell him that I never
> contemplated receiving a referral fee and as opposed to [D.C.G.] being taxed on
> it, I would like you to receive the funds."[72]

I replied to Pfeil's email at 5:07 P.M. asking him "...to send the referral fee

payment/check to me [at my home address via U.S. Mail]."[73]  On July 28 at 3:14 P.M., I

received an email from Pfeil explaining:

> "The check for $16,525.88 arrived yesterday at my office and is payable to me.  I
> called and spoke with [Kontos] this morning and told him that I was returning the
> check to him and would like him to send the funds to you since I don't want to get
> taxed on the payment and I never contemplated being compensated.  Attached is
> the correspondence that I received from [Kontos].  So, be on the lookout for the
> check from [Kontos].  Please let me know when you receive the funds."[74]

Attached to Pfeil's email was a scanned image of the $16,525.88 check 16077 drawn

on the K&M Law Group's IOLTA account at Dollar Bank (the "Referral Fee" or "Check

16077").[75] The signature on Check 16077 appears to be Mengine's.[76]  Included with

Check 16077 were scanned images of the supporting documentation necessary to

---

[71] Ex. pg. 185, para. 2.

[72] Id.

[73] Ex. 186, paras. 2-3.

[74] Ex. pg. 193.

[75] Ex. pgs. 194-195.

[76] Id.

conclude that the Referral Fee is 33% of the $49,500 "attorney's fee" received by Kontos from Travelers pursuant to the Order.[77]  Receiving Pfeil's email left me in stunned disbelief because it proved that D.C.G. was owed the Referral Fee based on nothing more than a brief email that Pfeil sent Mike and me on November 27, 2019.[78] Beyond that, and regardless of how sincere Pfeil's written explanation may have appeared, I never expected Kontos would send me a check for the Referral Fee.  It was preposterous to believe that Kontos, the same individual who negotiated a settlement with Travelers based on inaccurate and incomplete information, would simply turn around and send me a Referral Fee that Kontos expected to pay to D.C.G.  It made no sense, but that is exactly what happened.

49.     In mid-August, in an envelope sent via U.S. Mail by White on the Burns White letterhead, I received check 16113 for $16,525.88 made payable to me, for the Referral Fee ("Check 16113").[79]  Check 16113 was again drawn on the K&M Law Group IOLTA account at Dollar Bank and this check, too, appears to have been signed by Mengine.[80]  The transmittal letter with Check 16113 is on Burns White letterhead and is signed by White, who wrote: "This check represents payment of the referral fee that was paid to Attorney Eric Pfeil which he returned to Attorney Kontos."[81]  On August 16

---

[77]  Ex. pgs. 193-197.  The calculation is: ($16,525.88/$49,500=.3338)x100=33.38.

[78]  Ex. pg. 54.

[79]  Ex. pgs. 203-205.

[80]  Ex. pg. 204.

[81]  Ex. pg. 203, para. 1.

at 2:00 P.M., I sent Pfeil an email confirming I'd received Check 16113.[82]  And Pfeil's

reply?  At 2:52 P.M. the same day he responded: "Fantastic.  I know this doesn't make

up for all that you went through but hopefully it helps."[83]  I never deposited Check 16113

because it's evidence and I still have it in my custody.

50.    Following my Appeal and the attendant pleadings necessary to docket my

Appeal in Superior Court, the next step was for Judge Della Vecchia to author and

publish an opinion supporting his Order.  The Trial Court Opinion was signed by Judge

Della Vecchia on September 2, 2021 and I received a copy of it a few days later via

U.S. Mail.[84]  The T.C.O. is 10 pages long.  And after months of litigation, with nearly

1,000 pages of pleadings filed in the Matter, the deposition of Kontos, and the Hearing,

the T.C.O. contains one reference to the Pennsylvania Rules of Appellate Procedure

("Pa.R.A.P.") and four references to Pennsylvania case law; they are:

A.    "Pa.R.A.P. §1925;"[85]

B.    *"Ragnar Benson, Inc. v. Hemfield Township Mun. Auth*, 916 A.2d

1183, 1188 (Pa. Super. 2007);"[86]

C.    *"Muhammad v. Strassburger, McKenna, Messer, Shilobod and*

*Gutnik*, 587 A.2d 1346, 1349 (Pa. 1991);"[87]

---

[82] Ex. pg. 205.

[83] Ex. pg. 206.

[84] Ex. pgs. 217-227.

[85] Ex. pg. 223, para. 15.

[86] Ex. pgs. 223-224, para. 19.

[87] Ex. pgs. 225-226, para. 25.

23

D.      "*McDonnell v. Ford Motor Co.*, 643 A.2d 1102, 1105 (Pa. 1994);"[88]

     and

E.      "*Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999)."[89]

But within the 10 pages of the T.C.O., the writing itself contains 12 separate identifiable mistakes of fact, analysis, and procedure in the Matter.  And while all of them are identified and documented in the attached Annotated Trial Court Opinion, the first three may be most disturbing because they deal with the basic facts of the Matter itself; to wit:

F.      <u>T.C.O. page 1, para. 1, sentence 1</u>: "The current appeal to the Superior Court arises from a dispute between Leslie Gitelman and her then attorney, George Kontos and his firm of Kontos Mengine Killion & Hassen (hereinafter "KMKH")."[90]  This sentence is completely inaccurate.  The Appeal arises out of the M.V.A. and my Travelers Claim.  Collura, on Travelers behalf, filed the Petition against me and the entire Matter was me defending myself pro se, without a counterclaim.

G.      <u>T.C.O. page 1, para. 1, sentence 3</u>: "An executed Power of Attorney/Fee Agreement has been made part of the record. (Exhibit

---

[88] Ex. pgs. 226, para. 26.

[89] Id.

[90] Ex. pg. 218, para. 1.

1, Petition to Enforce Settlement, 10/29/20)."[91]  This sentence is also inaccurate.  The Petition was filed and served on October 22, 2020, not October 29, 2020.

H.   <u>T.C.O., page 2, para. 2, sentence 1</u>: "The underlying lawsuit necessitating this Agreement involved a motor vehicle accident in which Gitelman was seeking damages for injuries sustained due to the alleged negligence of Dawne Wilkinson when her vehicle rear-ended Gitelman on November 26, 2019."[92]  The inaccuracies in this sentence are disturbing; to wit: In the Petition, I'm named as the "Respondent/Plaintiff," but I never filed a counterclaim against Wilkinson/Travelers.  Also, Wilkinson was ticketed by the police at the scene for motor vehicle violation "3714A Careless Driving-General," so "negligence" isn't in question.  Finally, I was hit head-on while walking in broad daylight against traffic.  "Rear-ended" is completely inaccurate, with no basis in reality, and I established that conclusively in my Answer to the Petition filed on October 29, 2020.[93]

Based on these three verifiably false sentences in the first two paragraphs of the T.C.O., the reasonable and safe conclusion about the Matter is that Judge Della

---

[91]  Id.

[92]  Ex. pg. 219, para. 2.

[93]  Ex. pgs. 47-51.

Vecchia didn't comprehend or understand the most basic facts in the Matter.  And after that, he apparently ignored the facts in the T.C.R. and simply signed the Order, denying me the right to have my Travelers Claim correctly analyzed and valued based on my actual injuries and the bodily harm I sustained from the M.V.A.

51.     To understand the injuries and bodily harm I received in the M.V.A., the best place to start is with the professional medical opinions and prognoses of Dr. Siska and Dr. Hamlin.  Dr. Siska is an associate professor of orthopaedic surgery at the University of Pittsburgh Physicians, Department of Orthopaedic Surgery and the surgeon who reviewed my medical work up following the M.V.A.  I was admitted to Presby on November 26 and based on what I understood at the time, I was expecting to have surgery on my left shoulder early in the morning of November 27.  Following Dr. Siska's evaluation early that morning, his sense was that the break in my shoulder was simply too complex and severe to operate on successfully.  With that conclusion, the decision was made to let the shoulder fracture heal on its own and consider surgical options as time passed.  On March 15, 2021, 109 days after the M.V.A., Dr. Siska wrote:

> "[Following the M.V.A.], my hope for her was that she would improve in terms of her pain profile and that her stiffness would improve and that her strength would improve so that her active range of motion could approach her passive range of motion (although likely never completely given her tuberosity displacement).  My hope was that she would regain function in her shoulder to allow for activities of daily living with a tolerable pain profile.  However, with this type of injury she remains at risk for shoulder stiffness, chronic shoulder pain, and loss of functionality.  It is foreseeable in the future that she may choose surgical intervention, the most appropriate being a reverse total shoulder arthroplasty to allow for pain control and improve mobility.  She also may develop episodic flareups of shoulder pain or subacromial impingement from her tuberosity displacement at the greater tuberosity, which may require treatment with oral pain medications including NSAIDS, treatment with physical therapy, or even

corticosteroid injections, or some combination.  Overall, given that the last time I saw Leslie Gitelman in my office was approximately 13 months ago and at that time she was only 3 months from her injury, my prognosis as of her last office appointment in February 2020 was guarded."[94]

And following my last appointment with Dr. Siska on May 11, 2021, he wrote on July 15:

"As per the previous narrative report, my prognosis for her left shoulder remains guarded.  She has acclimated remarkably well given her injuries; however, she will likely have continued weakness and permanent decreased range of motion at her left shoulder.  If she should develop arthritic type symptoms or further decline and range of motion function perhaps a reverse total shoulder arthroplasty would be a consideration.  However, she may continue to require further treatment for her left shoulder including physical therapy type exercises, corticosteroid injections if she develops impingement type symptoms or rotator cuff bursitis, or pain medications including NSAIDs."

"I believe at this point she has reached maximal medical improvement and it is with a reasonable degree of medical certainty that made the above narrative addendum report."[95]

With this plain language at hand, the reasonable conclusion about the M.V.A. is that while my left shoulder has healed, the joint has a permanent loss of range of motion. Additionally, I'm at a lifetime risk for developing arthritis in my left shoulder and that I may require further treatment including "...physical therapy, corticosteroid injections...[and] pain medications including NSAIDs."[96]  Dr. Hamlin's opinion with respect to my right hip is equally bracing.  As previously noted, on November 26, 2019, I was days away from a hip replacement surgery I had been preparing for since August 12, 2019.  I was evaluated by Dr. Hamlin's Bone & Joint Center at UPMC Magee Womens Hospital during August 2019 and the conclusion was reached that I had

---

[94]  Ex. pg. 229-231, Note C, pg. 230-231.

[95]  Ex. pg. 233, Note E.

[96]  Id.

"...advanced degenerative arthritis [in my] right hip. [And that]...was having significant effects on [my] daily living and quality of life...."[97]  Following the M.V.A., the Covid-19 crisis struck and I chose to delay my needed hip replacement surgery because of the "...increased risk of complications if [I] were to contract Covid in the perioperative period."[98]  That risk hasn't disappeared and I still need to have my right hip replaced due to "...advanced degenerative arthritis."[99]  These serious medical situations described by Drs. Siska and Hamlin are directly attributable to the M.V.A.

## Statement of Complaint

52.     This Complaint may be summarized as follows: On November 26, 2019, Wilkinson hit me head-on with her Vehicle while I was walking against traffic along Redfern with Mike and our dog Max.  The impact of that M.V.A. resulted in extremely serious bodily harm to me, requiring months of recovery.  And while my bones have healed, I remain at lifetime risk for arthritis in my left shoulder and have limited range of motion in that joint, which surgery may not completely remedy.

53.     Based on the written recommendation provided to me by Pfeil, I met with Kontos on December 2 and that meeting resulted in my signing the Solicitation Documents that began Kontos's representation of me in my Travelers Claim.

54.     Kontos never told me that Mengine, Kontos's business partner in the K&M Law Group, had been suspended from practicing law the same day I was hit, and

---

[97]  Ex. pg. 232, para. 2.

[98]  Ex. pg. 232, Note D.

[99]  Id.

28

instead Kontos conducted the negotiation process with Travelers without ever informing me about the situation with Mengine.

55.     By late July, the elements of a settlement agreement appeared to be in focus, but I rejected the terms of the Draft Release prepared and emailed by Scott, and notified Kontos of that fact via email late in the afternoon of July 29.

56.     My serious concerns about Kontos's evasiveness and inability or unwillingness to answer my questions caused me to research Mengine. From that effort, I learned the Board suspended Mengine on November 26.  In later research, I learned Kontos's solicitation of my business on December 2 was in violation of Rule 217 of the Pa.R.D.E.

57.     Very shortly after learning about Mengine's suspension, I resolved to fire Kontos on Monday morning, August 3 and did so at 9:15 A.M. that day.  Starting then, I began my Review of the information surrounding my Travelers Claim and learned from UPMC's medical records staff that Kontos had provided inaccurate and incomplete information to Travelers.  As a result, the $150,000 value assigned to my Travelers Claim was incorrect and the terms of the settlement denied me the fair and full value of my Travelers claim.

58.     In my October 2, 2020 Letter, which I faxed and emailed to Scott, I definitively notified Travelers that there were problems with my Travelers Claim.  At the time, I expected Scott to address the concerns raised in my October 2, 2020 Letter.

59.     Instead, on October 22, Collura had me served with the Petition and a litigation ensued that lasted until July 12, 2021, when Judge Della Vecchia handed Collura the Order in his courtroom.

29

60.     That Order resulted in Collura authorizing Travelers to draft and transmit two checks via the U.S. Mail: one was to the K&M Law Group in the amount of $49,577.53, and the other was the $100,422.47 Settlement Check sent to me at my home address.

61.     I filed an Appeal of the Order and the Matter is now before the Superior Court.

62.     Completely unbeknownst to me, the written referral by Pfeil was made pursuant to a referral fee arrangement between K&M Law Group and D.C.G., possibly managed by Kevin Harkins for D.C.G. and by Kontos for the K&M Law Group. The Referral Fee was payment to Pfeil for recommending Kontos to me in the first place.

63.     The Trial Court Opinion filed by Judge Della Vecchia is factually and analytically inaccurate.  With the T.C.O. now on record and the $150,000 in funds transferred at Collura's behest, the Trial Court has been enfranchised by Collura and Kontos to execute what appears to be a $150,000 interstate insurance fraud scheme, with both Travelers and me being defrauded (the "Fraud Scheme").

64.     Because I never filed a counterclaim against Travelers in response to the Petition, I'm filing this Complaint in the District Court to ensure my rights under the M.V.F.R.L. are preserved, and that both Travelers and Geico remain obligated to settle my bodily injury claim pursuant to the terms and coverages provided by the Total Coverages Limit of $1,100,000.[100]

---

[100]   Paragraph 4.d. of this Complaint for a definition of the Total Coverages Limit.

**Issues and Attendant Criminal Theories Identified in the Matter**

65.     Collura's filing of the Petition began a litigation against me that I defended

pro se.  And while the events of the Matter are chronicled in the T.C.R. and supported

by the pleadings therein, during the Matter I identified the following issues and attendant

criminal theories that support this Complaint and my belief that Travelers and I have

been victims of the Fraud Scheme.

66.     Issue 1: Kontos's December 2 solicitation violated Rule 217 of the

Pa.R.D.E.: With Mengine's suspension on November 26, 2019, Mengine was prohibited

from soliciting business.  That restriction is spelled out in Rule 217.  And with that

restriction, Kontos and every other attorney at the K&M Law Group were prohibited from

soliciting business using Mengine's name, or any document with Mengine's name

appearing on or in it.  During the Matter, I analyzed the facts in this Issue 1 for the Court

in my March 8, 2021 Response to Motion to Adopt and Join in the Petitioner's Petition to

Enforce Settlement and Brief in Support Thereof (the "Response to Motion to Adopt").[101]

In "Section F: Conclusions and Questions for Further Investigation," I reached 10

different conclusions about the Mengine Report and the attendant Rule 217 violations

committed by Kontos and Mengine and crafted 10 different "...questions for further

investigation."[102]  And based on these Rule 217 violations, I concluded that Kontos's

December 2 solicitation of my business violated Rule 217.  As such, all actions

---

[101]  Ex. pgs. 234-312.

[102]  Ex. pgs. 253-257.

taken by Kontos, the K&M Law Group, and any other person employed by or affiliated with them were invalid, null, and void.

67.     Issue 2: The P.O.A. in the Solicitation Documents is not legally crafted, valid, or enforceable.: The P.O.A. contained in the Solicitation Documents is a completely defective legal writing and instrument.[103]  Yet, it was based on this P.O.A. and the "authority" Kontos thought it conferred on him to negotiate with Travelers that the $150,000 settlement was crafted.  When I signed the Solicitation Documents on December 3, I had never researched power of attorney law in Pennsylvania, but I did so in preparation for drafting my February 4, 2021 "Answer to Petition to Intervene."[104] From that research, I learned that the K&M Law Group P.O.A. isn't a legally enforceable power of attorney document and it doesn't authorize K&M Law Group or its personnel to do anything on my behalf, but the Trial Court ignored my findings and analysis and granted the Kontos Petitions twice.

68.     Issue 3: Collura's filing of the Petition violated the scheduling requirements in the Pa.R.C.P. and the Allegheny County Local Rules.:  Following the October 2, 2020 Letter to Scott, I expected to receive a written reply from Travelers, either from Scott or someone else, that addressed my concerns.  Instead, on October 22, 2020 I was served with the Petition, first by email at 11:25 A.M. and later that day by Federal Express.  Attached to the Petition was a blank rule to show cause.  Then, five

---

[103]  Ex. pg. 58.

[104]  Ex. pgs. 314-359.

days later on October 27, 2020, I received the completed rule to show cause in the U.S. Mail with the following information completed in handwriting by Judge Della Vecchia:

A.   Any Answer to the Petition is due: <u>10/29/2020</u>.

B.   Depositions shall be completed by: <u>11/27/2020</u>.

C.   The brief of the moving party is due: <u>Dec 4, 2020</u> (at least 14 days prior to argument).

D.   The brief of any opposing party is due: <u>Dec 4, 2020</u> (at least 7 days prior to argument).

E.   Argument is scheduled for: <u>Dec 9, 2020 at 11:30 A.M. by telephone</u>.

The date stamp for the Court of Common Pleas reads: "2020 Oct 23 PM 3:43" and the filing date stamp in the clerk's office reads: "FILED 2020 Oct 26 AM 9:16."[105] From this information, the following can be reasonably concluded:

(1)   Collura had me served on October 22;

(2)   The court signed the Rule to Show Cause on October 23 and gave me six days to prepare an answer and have it served;

(3)   Discovery was to be completed 29 days later;

(4)   Briefs were due seven days later; and

(5)   Argument was scheduled for five days after the filing of briefs.

It's obvious that this timeline has not been created with a respondent's interests in mind. Fortunately, I've been working in management consulting for many years, so I'm

---

[105]  Ex. pg. 131.

used to assembling paperwork under tight deadlines.  But the first thing I did after

receiving the first rule to show cause in the U.S. Mail – and to be clear it was never

emailed to me – was consult the "Allegheny County Civil and Family Court Rules" as

posted on the website of the Allegheny County Court of Common Pleas (the "Local

Rules").  In the Local Rules, it's perfectly clear that petitions are to be presented to the

motions judge **10 days** after service on the respondent to the petition; to wit:

> "Local Rule 206.4 (c) Procedures for the Disposition of Petitions - pages 10 and 11."[106]

> "(2) General Docket Cases - Opening a Default Judgment (a) A petition to open a default judgment shall be presented to the Motions Judge.  It may be presented only after service of a copy on the petition and notice of the date of presentation on all other parties.  Except in cases of emergency or with the consent of all other parties, <u>the date of presentation shall be at least ten (10) days after service of a copy of the petition and notice of the date of presentation</u>." [Emphasis added.][107]

> "*Note*: The court does not schedule the date and time of the presentation.  The petitioner selects a date and time at which the Motions Judge is hearing motions and petitions.  See Civil Division link on the Website of the Common Pleas Court of Allegheny County (www.alleghenycourts.us) for the name and courtroom of the judge who is sitting as the Motions Judge and the times that matters which have not been scheduled with the court may be presented.  Ordinarily, unscheduled matters may be presented each day at 9:30 A.M. and 1:30 P.M."[108]

If the Local Rules specifically state that I was supposed to be served and then Collura

would go to court "...at least ten (10) after service...," why was I served with the Petition

---

[106]    See: Local Rules at: https://www.alleghenycourts.us/downloads/civil/local_rules/local%20rules%20master%20file.pdf.

[107]    Id.

[108]    Id.

on October 22 and then Judge Della Vecchia dates the first rule to show cause on

October 23?  The language in the following sentence from the second quoted

paragraph above provides the answer; to wit:

> "*Note*: The court does not make the date and time of the presentation.  The
> petitioner selects a date and time at which the Motions Judge is hearing motions
> and petitions."[109]

The implication of this sentence is that Collura appears to have "selected" Judge Della

Vecchia, most likely because she knew, based on her experience and possibly Judge

Della Vecchia's reputation, that he'd be sympathetic to her Petition.  To be clear, I was

given six days, from October 23 to 29, to prepare my Answer to the Petition.  But I didn't

even know it was six days because I didn't receive Judge Della Vecchia's signed rule to

show cause until October 27, when the envelope was delivered to my home address via

U.S. Mail.  So, I was actually given **two** days to finalize and file my Answer.

69.     Issue 4: The W.J.F. Alias used by Travelers is an unregistered trade name

in Pennsylvania.: Beginning with the Petition and continuing with every pleading in the

Matter thereafter, every document has been authored and filed by Collura, in her own

hand and over her signature, with pleadings filed in the D.C.R. stating plainly that

Collura is an "Attorney at Law" working in the "Law Office of William J. Ferren &

Associates, Pittsburgh, Pennsylvania, email address: ECollura@Travelers.com (the

"W.J.F. Alias")."[110]  In every instance, Collura's pleadings have been filed in the D.C.R.

and then transmitted via email using the W.J.F. Alias.  I've never been able to figure out

---

[109]  Id.

[110]  Ex. pgs. 30-33 and 44.

why, but I did ask Kontos about it at the Deposition and his response made little

sense:[111]

> Question: "Okay.  To the best of your belief and knowledge, Ms. Collura works
>
> directly for the Travelers Companies as a Senior Counsel here in Pittsburgh?"[112]
>
> Collura: "I place an objection to the relevance.[113]
>
> Answer: "Yeah, when you say "works directly" for them, I don't really know what
>
> that means.  But I do understand, and my understanding and belief is that Ms.
>
> Collura works for the firm that she represents that she works for and that they do
>
> work for Travelers Insurance Company."[114]

In the Pennsylvania Department of State (the "Pa. DOS") database, there's no record of

the  "Law Office of William J. Ferren & Associates;" there's also no record for "William J.

Ferren & Associates."[115]  But there is a record for a "William J. Ferren," attorney ID:

52580; admitted: 11/3/1988; address: 10 Sentry Parkway, Suite 301, Blue Bell, PA

19422 ("Ferren").  In the same Pa. DOS record for Ferren, it states that Ferren is

employed by "William J. Ferren & Associates," but the same record later notes:

> "I do not maintain professional liability insurance because I do not have private
> clients and have no possible exposure to malpractice actions (e.g. retired, full-
> time in house counsel, prosecutor, full-time government counsel, etc.)"

---

[111]  Ex. pgs. 166, line 14 to 168, line 12.

[112]  Ex. pg. 167, line 13.

[113]  Ex. pg. 167, line 17.

[114]  Ex. pgs. 167, line 19 - 168, line 1.

[115]  See: https://www.corporations.pa.gov/Search/CorpSearch.

With this plain language in the Pa. DOS database, it appears that Collura doesn't have active malpractice insurance coverage as an attorney practicing in Pennsylvania, but she does have access to the Travelers email system and the ability to authorize $150,000 in check disbursements from a Citibank, N.A. checking account located in New Castle, Delaware with the checking account number ending: 8306.[116]

70.   Issue 5: Judge Della Vecchia's October 23, 2020 scheduling order violated the discovery scheduling process .  The rule to show cause Judge Della Vecchia signed on October 23 states that "Depositions shall be completed by 11/27/2020" and that briefs are then due on "Dec 4, 2020," seven days later with "argument" scheduled for "Dec 9, 2020 at 11:30 A.M. by teleconference."  So, Judge Della Vecchia schedules an interval of seven days between the end of discovery and the filing of briefs, with argument scheduled five days later.  And what do the Local Rules say about this timeline?  Here's what they say:

"(c) Depositions and other evidence that a court may consider shall be filed at least fourteen (14) days before the argument date."[117]

"(d) Briefs are required.  The brief of the moving party shall be filed with the Department of Court Records and served on all other parties at least fourteen (14) days prior to argument.  The brief of the party opposing the petition shall be filed at least seven (7) days prior to the argument."[118]

---

[116] Ex. pg. 181.

[117] Id.

[118] Id.

But what about conflicts between the Local Rules and the Pa. R.C.P.?  Well, at "231 Pa. Code § 206.6 - Rule 206.6 - Rule to Show Cause. Issuance as of Course. Stay. Form of Order," the following language appears:

> "(a) A rule to show cause shall be issued as of course upon the filing of the petition.  The rule shall direct that an answer be filed to the petition within twenty days after service of the petition on the respondent."

According to the Local Rules and the Pa. R.C.P., the conclusions here are straightforward.  If a petitioner goes to court in Pennsylvania, the respondent is supposed to be given at least ten days, but no more than 20, to file an answer.  And that's **after** the petitioner has given the respondent 10 days before the petitioner is supposed to appear in court requesting a rule to show cause.  With these intervals added together, a respondent is supposed to have at least 20 days to draft and file an answer to a petition (i.e., the 10 days before the petitioner appears in court, plus the minimum of 10 days to prepare an answer following a petitioner's appearance in court).  And how much time was I given?  Collura gave me one day between when I was served on October 22 and when she appeared before Judge Della Vecchia on the 23rd.  Then at that appearance, Judge Della Vecchia gave me six days in his first rule to show cause.  So, I was given a week – October 22 to October 29.  And even with that compressed time frame, I was able to research, draft, and finalize a 20-page Answer that included 51 pages of annotated exhibits, but that's probably not what Collura and Judge Della Vecchia had anticipated on October 23.  This scheduling order was amended by Judge Della Vecchia on December 1, 2020.  Following the filing of my Answer on October 29, 2020, the Matter became a litigation on Judge Della Vecchia's docket.  The Matter went through discovery and Kontos was deposed.  But riding on the

coattails of the Petition, Kontos filed a Petition to Intervene that provided him with the foundation to seek $49,577.53 in fees and expenses.  That Petition to Intervene was critical because without it, he wouldn't have the right to seek attorney's fees from me because I'm representing myself.  So, Kontos **needed** Collura in the Matter because without her filing the Petition, he would have no legal basis to pursue the money through litigation against me.

71.      Issue 6: Collura's intentional concealment of the October 2, 2020 Letter during discovery is suspicious, goes to consciousness of impropriety, and possible knowledge of and participation in the Fraud Scheme.: During discovery in the Matter, Collura intentionally concealed the October 2, 2020 Letter even after I filed it in the D.C.R. as Exhibit H to my Answer.[119]  Significantly, Collura did include my October 2, 2020 transmittal email message to Scott as page 278 of her document production, but not the attached October 2, 2020 Letter.[120]  I compelled Collura to produce the October 2, 2020 Letter and the Court granted my motion.[121]  Collura produced the document very shortly thereafter via email to me and the Court.  It can be argued that Collura's concealment of the October 2, 2020 Letter was an attempt to distance herself from the Fraud Scheme.  How? By intentionally concealing the document it could lead an objective observer, in this case Judge Della Vecchia or a law enforcement authority, to conclude that she never saw it and it never passed through her custody.  But it did.

---

[119]  T.C.R. pgs. 80-87.

[120]  T.C.R. pg. 166.

[121]  T.C.R. pg. 548.

Scott sent Collura the October 2, 2020 Letter because Collura had my transmittal email message to Scott and included it in Travelers's discovery production.

72.   <u>Issue 7: Collura's including the Deposition Transcript in the Trial Court Record violated Rule 4002.1 of the Pa.R.C.P. governing the filing of discovery documents in the D.C.R.</u>: On January 27, 2021, Collura filed her "Brief In Support of Petition to Enforce Settlement " (the "Brief In Support").[122] Attached as Exhibit A to Collura's brief is the complete Transcript of the December 17, 2020 Kontos Deposition.[123]  The body of Collura's Brief In Support is seven pages long and the total filing, including all exhibits, is 166 pages.[124]  The foundational cornerstone of discovery is that it's an essentially confidential process and the information obtained from it is sensitive and supposed to remain so unless its disclosure is required by a court or other investigative process.  In the Matter, Collura apparently didn't understand that imperative because by including the entire Transcript with her Brief In Support, she violated "Pa.R.C.P. Rule 4002.1. Filing Discovery Material," which states: "Discovery material shall not be filed unless relevant to a motion or other pretrial proceeding, ordered by the court or required by statute."[125]

73.   <u>Issue 8: White's failing to file the Kontos Petitions in the D.C.R. is suspicious and procedurally questionable.</u>: As previously described in this Complaint,

---

[122]  T.C.R. pgs. 193-359.

[123]  T.C.R. pgs. 203-337.

[124]  Id.

[125]  See: *231 Pa. Code Rule 4002.1. Filing Discovery Material.*

White twice filed the Kontos Petitions with the Court, but only once in the D.C.R.  In both instances, I objected to the Court granting the Kontos Petitions, but I was ignored both times.  The filing of the Kontos Petitions never made sense to me because a petition to intervene, generally, is not a legal mechanism I understand to be appropriate or legal when used between an attorney and a former client.  But Judge Della Vecchia granted the Kontos Petitions twice.  And that act was instrumental in the Fraud Scheme because it permitted K&M Law Group to receive the $49,577.53 payment from Travelers, with Collura's authorization and at her behest.

74.    Issue 9: Collura and Kontos's prior working relationship is at the heart of the Petition and Travelers is accountable for it.  Without Collura's filing of the Petition, the Fraud Scheme wouldn't be possible.: After the misconduct of Kontos and Mengine, Collura's behavior in the Matter is almost incomprehensible.  Collura is employed by Travelers as a senior counsel and knows Kontos personally because her first job out of the University of Pittsburgh School of Law ("Pitt") was working as an associate at the law firm then known as S.P.K., where Kontos was a partner.  It's possible that Collura met Kontos while she was a law student at Pitt, where Kontos was an adjunct instructor.  Collura graduated from Pitt in 2007 and Kontos's bio states:

> "Since, [sic] 2006 George has served as a member of the adjunct faculty of the University of Pittsburgh School of Law, as a lecturer in Advanced Trial Evidence."[126]

---

[126]    Kontos's bio appears at: https://www.kontosmengine.com/MeetAttorneys.html.

Following her tenure at S.P.K., Collura went to work at Thorp Reed & Armstrong ("Thorp Reed"), where she spent several years before leaving to work for Travelers.  Collura's career history can be summarized as follows:[127]

> A.   Student Law Clerk, Allegheny County Court of Common Pleas, Hon. John A. Zottola, March 2005-August 2005;
>
> B.   Law Clerk, Stember Feinstein Doyle & Payne, 2005-2006;
>
> C.   Intern, The Office of the District Attorney of Allegheny County, April 2005-April 2007;
>
> D.   Graduates from Pitt, 2007;
>
> E.   Attorney, Swensen Perer & Kontos, August 2007-December 2010;
>
> F.   Senior Attorney, Clark Hill Thorp Reed, December 2010-April 2017; and
>
> G.   Senior Counsel, Travelers, April 2017-Present.

In the Deposition Transcript, my questioning of Kontos about his relationship with Collura appears at page 17, line 21 through page 22, line 4, and Kontos did his best to spin it during my questioning, but at page 20, line 18, I asked:

> Question: "Outside of your prior professional working relationship with Ms. Collura, do you consider Ms. Collura a personal friend?"
>
> Collura: "Object to the relevance."
>
> Answer: "Well, I would say that I consider her, first and foremost, a colleague that I know through the bar.  When you say "a personal friend,' if by that you mean we get together socially and communicate on any kind of regular basis or do things together or with our spouses, then, no, I don't.  But I consider her a professional colleague, and I guess that is the way that I would answer that question."[128]

---

[127]  Ex. pgs 421-424 for Collura's LinkedIn bio.

[128]  Deposition pg. 17, line 22-pg. 22, line 4. T.C.R. pgs. 219-224.

The exchange between Kontos and me included Collura objecting to almost every question I asked Kontos about their shared work history. And why did Collura object to my questions?  Perhaps it's because Kontos used his prior professional relationship with Collura to induce her to file the Petition.

75.    Issue 10: Collura and Scott's actions violate the Travelers Code of Conduct in eight different ways and these violations helped make the Fraud Scheme possible.:  Objectively considered, why would a publicly-traded insurance company, in this case Travelers, that dates its founding back to 1853, not want to help me understand why my claim was analyzed and valued the way it was?[129]  Doesn't Travelers want to deal with harmed third-parties, in this case me, fairly and in good faith?  From the facts in this Petition matter, the answer appears to be "no."

76.    To put this matter in perspective, it will be helpful to summarize briefly the size of Travelers as a corporation.  For the year ending December 31, 2019, Travelers, on a consolidated basis, generated "net income of $2.62 billion, or $10.01 per share basic and $9.92 billion per share diluted."[130]  In the same 2019 period, Travelers generated "net premiums of $28.27 billion."[131]  At the end of 2019, Travelers had "total

---

[129]  Stock in Travelers trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TRV."  As such, Travelers is required by Section 13 or 15(d) of the Securities Exchange Act of 1934 to file a Form 10-K ("Form 10-K") with the United States Securities and Exchange Commission (the "S.E.C.").  This analysis presents information from Form 10-K for Travelers's 2019 fiscal year ended December 21, 2019 (the "2019 10-K").  See: the Form 10-K at page three, para. one, item one, at "Business."

[130]  See the 2019 10-K, page 61, at "Financial Highlights."

[131]  Id.

investments of $77.88 billion" and "fixed maturities and short-term securities comprise[d] 94% of total investments."[132]  Based on these facts from the 2019 Form 10-K, it's logical to conclude that Travelers is very well capitalized and highly profitable.  But I'm not a Travelers shareholder.  Instead, I was hit by Wilkinson's Vehicle and I was a respondent to the Petition and am now a Plaintiff in this Complaint because, Travelers's personnel didn't want to help me understand how my Travelers Claim was calculated and valued.

77.     What about Travelers claims professionals? According to the 2019 Form 10-K:

"[Travelers] claim functions are managed through its Claims Services organization, with locations in the United States and in the other countries where [Travelers] does business.  With more than 12,000 employees, Claims Services employs a group of professionals with diverse skills, including claim adjusters, appraisers, attorneys, investigators, engineers, accountants, nurses, data and analytics professionals, systems specialists and training, management and support personnel.  Approved external service providers, such as investigators, attorneys and, when necessary, independent adjusters and appraisers, are available for use as appropriate.  United States field claim management teams located in 16 claim centers and 51 satellite and specialty-only offices in 44 states are organized to maintain focus on specific claim characteristics unique to the businesses within the [Travelers'] business segments."[133]

And based on these facts from the 2019 Form 10-K, it's reasonable to conclude that Travelers employs literally thousands of individuals involved in processing claims received against Travelers every year.  So, my Travelers Claim was probably just one of tens or hundreds of thousands that Travelers processes annually.  So, why didn't

---

[132]  Id.

[133]  See 2019 Form 10-K, page 16, at "Claims Management," paras. 1 and 2.

Scott simply send me an email that addressed the questions in my October 2, 2020

Letter?

78.     Finally, it will be helpful to examine what expectations Travelers has for its

officers, directors, and employees.  Does Travelers have explicit written expectations for

how its personnel should conduct themselves?  The answer to that question is: "Yes."

Travelers has a written "Code of Business Conduct and Ethics" available on  Travelers'

website (the "Code of Conduct").[134]  The clear and unambiguous plain language in the

Code of Conduct sets high expectations; to wit:

> A.     "Please remember, [Travelers] employees who get results at the
> cost of legal violations, through dishonest dealings or other
> unethical behavior, do more than just violate our standards.  They
> undercut our ability to create shareholder value and serve our
> stakeholders by undermining our reputation."[135]
>
> B.     "The Code of Conduct applies to all employees, officers and
> directors of Travelers, and provides principles for each of us to
> follow in the performance of our activities on behalf of Travelers.
> The Travelers Companies, Inc. and its subsidiaries...expect all
> employees, officers, and directors to act in accordance with the
> highest standards of personal and professional integrity and ethics
> in their work for the Company."[136]
>
> C.     "Compliance with Laws, Rules, and Regulations/Cooperation: It is
> the Company's policy to comply with all applicable laws, rules and
> regulations.  It is the personal responsibility of each employee,
> officer and director to adhere to the requirements imposed by the

---

[134]  Ex. pgs. 443-463.  See:
https://investor.travelers.com/corporate-governance/code-of-conduct/default.aspx.

[135]  Ex. pg. 445, Note A.

[136]  Ex. pg. 448, Note B.

laws, rules and regulations in every jurisdiction where the Company operates."[137]

D.      "Reporting Concerns and Non-Retaliation: You are expected to immediately report known or suspected violations of this Code of Conduct, Travelers policies or applicable laws and regulations."[138]

E.      "Conflicts of Interest: A conflict of interest occurs when an individual's private interests interfere - or even appear to interfere – with the interests of the Company.  All employees, officers and directors are expected to avoid any situation that involves a conflict of interest between personal and professional relationships, You have an ongoing obligation to disclose an actual or potential conflict of interest at the time it arises and have an ongoing duty to supplement disclosures as circumstances dictate."[139]

F.      "Personal Relationships: As an employee, officer or director of Travelers, you may not use your position or influence to impact a business decision that places Travelers' interest secondary to your own personal interests or those of a relative or someone with whom you have a close personal relationship.  This includes exercising control over personnel decisions, claim outcomes, underwriting decisions or the selection or management or a vendor, in any case in which you have an interest, without the authorization of the enterprise Chief Ethics and Compliance Officer or his/her designee."[140]

G.      "Claim Handling: Travelers' policy is to handle claims fairly by paying what we owe and following the terms of the applicable insurance policies and all claim handling standards contained in the applicable statutes and regulations.  Claim personnel are expected to act promptly and in good faith when handling claims.  In addition, all instances of suspected fraud will be investigated and reported to the proper authorities."[141]

---

[137] Ex. pg. 449, Note C.

[138] Ex. pg. 449, Note D.

[139] Ex. pgs. 451-452, Note F.

[140] Ex. pg. 453, Note G.

[141] Ex. pg. 459, Note I.

H.    "Violations: All Company employees, officers and directors are expected to understand and comply with the principles set forth in this Code of Conduct. [Later in the same paragraph.] Violating, as well as encouraging others to violate this Code of Conduct, the Company's policies, or applicable laws and regulations, may result in disciplinary action.  Disciplinary action may include immediate termination of your employment or relationship with the Company.  Furthermore, you will be held personally responsible for any improper or illegal acts you commit during your relationship with the Company.  You may also be held responsible for the action or inaction of others if you knew about, should have known about, or encouraged their misconduct.  Your activities my also be reported to, or otherwise reviewed by, regulators and authorities, which could result in criminal or civil penalties, including imprisonment."[142]

79.    With the clarity and high expectations created by the Code of Conduct, what possibly explains the Petition?  Following my October 2, 2020 Letter, the reasonable, responsible, and smart thing to do would have been to contact me and work with me to answer the questions I had and then explain how the $150,000 value of my claim was calculated.  And as I've already made clear, that never happened.

80.    Instead of working with me as I had respectfully requested, Travelers filed the Petition against me.  But was that a good idea?  No, it definitely wasn't because the Matter has now been subjected to discovery, Kontos has been deposed, and with the transfer of $150,000 with Collura's authorization and at her behest, Travelers and I appear to have been defrauded.

81.    In the final analysis of this matter, there's one person who could have made a substantial difference in how Travelers handled this matter and that person is Collura.  Collura authored and filed the Petition and Collura has filed every single Travelers pleading in the Matter.  But why take a risk in the Pennsylvania judicial

---

[142] Ex. pg. 460, Note J.

system, and now in the District Court, if I could have been assuaged and dealt with through a fact-based discussion and exchange of documents?  That definitely would have been a lower risk approach to take and it also would have been consistent with the expectations that Travelers sets for all its employees in the Code of Conduct.  The only explanation for this conduct is money, presumably obtained through the Fraud Scheme by Kontos and Collura.

82.   Issue 11: K&M Law Group's Referral Fee payments violate Pa.R.P.C. Rule 7.2 Advertising (c).[143]  Following the filing of the T.C.O. by Judge Della Vecchia, I never expected to hear from Pfeil about something he had almost nothing to do with. Instead, I learned from Pfeil that K&M Law Group, at Kontos and Mengine's direction and with their direct participation, pays referral fees in violation of Pa.R.P.C. Rule 7.2(c) ("Rule 7.2(c)").  In preparation for the Deposition, I included questions about the sentence in the P.O.A. that reads:

> "Kontos Mengine Killion & Hassen may share a percentage of their fee as a result of a referral from other legal counsel.  This fee sharing will not affect the total fee charged to the client as stated above."[144]

A summary of Kontos's answers to my questions follows:

Question: Does K&M Law Group pay referral fees? Answer: Yes.[145]

Question: How much of a referral fee does K&M Law Group pay? Answer: Between 25 and 50 percent of the fee earned by K&M Law Group.[146]

---

[143]  Ex. pg. 212, Note C and pg. 214, Note D.

[144]  Ex. pg. 58, para. 2, sentence 2.

[145]  Ex. pgs. 154, line 20 -155, line 6.

[146]  Ex. pg. 155, lines 7 - 23.

Question: How often does K&M Law Group pay referral fees? Answer: Often.  "I would say that a lot of our work comes from other attorneys.  Not all of it does; and in those instances where it doesn't, we don't.  But certainly, a fair amount of our work is referral based."[147]

Question: Why does K&M Law Group pay referral fees?  Answer: "Well, the rules in Pennsylvania encourage it; and they encourage it, because, you know, if I am a practitioner that does bankruptcy, and I have a personal injury motor vehicle claim, there is incentives that are built into that system that would  say, 'Let's get that case into the hands of somebody that knows what they are doing.' Just like I wouldn't take a bankruptcy case. So I think that is one of the reasons; but I think, first and foremost, is the law allows it and actually encourages it in Pennsylvania, to a certain extent, and that has been a part of our business model as a result."[148]

With Kontos's fraudulent solicitation as a beginning of this story, and his answers at the Deposition as a mid-point, the end of this story is the Referral Fee payment checks, and that's plural because there were two checks signed to pay the one Referral Fee.  These payments are patent violations of Rule 7.2(c).  But what's more striking than seeing copies of the checks in the Exhibits to this Complaint is the realization that payments of this type are a "...part of the [K&M Law Group] business model..."[149]  Kontos's statement there, coupled with his prior statement that he and Mengine pay referral fees "often" means that Kontos and Mengine operate K&M Law Group as an enterprise whose "business model" is based on intentionally and systematically violating Rule 7.2(c).[150] After that, it's equally shocking to realize that with Kontos's admission that: "I would say a lot of our work comes from other attorneys," every time K&M Law Group

---

[147]  Ex. pg. 156, lines 5-12.

[148]  Ex. pgs. 156, line 13 - pg. 157, line 4.

[149]  Ex. pg. 157, lines 3-4.

[150]  Ex. pg. 156, line 7.

pays a referral fee, it's creating two violators because if it's a violation of Rule 7.2(c) to pay a referral fee, then it's an equally serious violation for someone to accept a referral fee payment.[151]  While Kontos doesn't understand that what he and Mengine are doing at K&M Law Group is wrong, apparently Pfeil does because he couldn't return the Referral Fee fast enough.

<u>**Summary Analysis of Issues 1-11**</u>

83.     In the summary analysis of these issues, it appears possible that Kontos and Mengine are operating K&M Law Group as a criminal enterprise and using the payment of referral fees to generate business.  Those referral fees are paid generously, regularly, and to anyone who recommends K&M Law Group.

84.     Then using the P.O.A. document at issue in the Matter, K&M Law Group personnel modify authorization documents that create claim files and records for insurers that are inaccurate and incomplete.  Basically, just enough information to trigger a settlement, but no more.  Once those settlements are rushed through, settlement checks are sent to the K&M Law Group offices, where client signatures are forged onto those checks and then deposited into the firm's IOLTA account.

85.     Also, it's possible that Collura was paid by Kontos to file the Petition against me.  Instead of representing Travelers's best interests and reevaluating my claim to assure a fair and full settlement amount, Collura filed the Petition as an intimidation tactic that spun out of control almost immediately.

---

[151]  Ex. pg. 156, lines 9-10.

86.     And how could Collura be sure that the Petition would be favorably received?  Because with her experience in Allegheny County, first at S.P.K. and later in her career, she knew when Judge Della Vecchia would be the motions judge in the Court of Common Pleas and she simply waited until it was his turn and then appeared before him that day.  That waiting explains the interval between the October 2, 2020 Letter and the date I received the Petition: October 22, 2020.

87.     And, how did Collura know Judge Della Vecchia would be supportive of her Petition?  Judge Della Vecchia's statements at the Hearing implied his background includes insurance work and, as a result, he's probably sympathetic to insurance companies.  Thinking expansively, but still within the provable facts that Kontos and Mengine pay referral fees for clients, there is the reasonable possibility that other individuals could be receiving payments, too.  Yes, that possibility is disturbing to suggest, but with Kontos and Mengine's reputation for paying, and paying handsomely, for results that help them and the K&M Law Group, it's not out of the realm of possibility.  And in this situation, Kontos needed the help.  Collura was able to provide it, and with Judge Della Vecchia sitting in judgment of the Petition, everyone except me knew he was going to approve it.  And that helps to explain why I had to appeal before he wrote his T.C.O.

88.     What about White?  White testified on Mengine's behalf as a character witness at Mengine's disciplinary hearing before the Board.[152]  How much White knows about Kontos and Mengine's violations of the Pa.R.P.C. and the Pa.R.D.E. is open to

---

[152]    See the Mengine Report, at page 45, paras. 208 and 209.

speculation, but the August 12, 2021 letter to me on Burns White stationery, over

White's signature, states:

> "I enclose Kontos, Killion & Hassen Iolta Check Number 16113 payable to you in the amount of $16,525.88.  This check represents payment of the referral fee that was paid to Attorney Eric Pfeil which he returned to Attorney Kontos."

And this language is a written admission, not protected by attorney-client privilege, that

White knows about the check and apparently he approves of it because if he didn't,

White should have had Kontos send it to me directly, which is exactly what Kontos did

when he sent the first referral fee payment check to Pfeil.

89.    Finally, what about Travelers?  Does anyone in senior management know

about this situation?  That question appears to merit a thorough investigation. With

Collura and Scott's documented actions and violations of the Code of Conduct, it would

be difficult to explain how senior management wouldn't be concerned about this

Complaint.

### Attendant Criminal Theories

90.    After the documented issues and violations identified in this Complaint, the

totality of this matter brings forward the following criminal theories from the United

States Code (the "U.S.C.") and the Pa. Code.

91.    <u>Criminal Theory 1: Insurance Fraud, 18 U.S.C.§ 1033 and 18 Pa. C.S.A. §</u>

<u>4117</u>: This theory is established by the actions of Kontos, Collura, and Scott. With their

joint actions, insurance fraud has occurred because my October 2, 2020 Letter

definitively notified Scott and then Collura that my Travelers Claim file was inaccurate

and incomplete.  Yet, no effort was made to work with me, as I had requested, to correct

the file.  Instead, I was served with the Petition.

92.     And who was defrauded?  Travelers was, and I was, too.  I've been denied an insurance settlement for the fair and full value of my claim.  But in forcing the settlement through the Court, Travelers, too, has been defrauded because the company has paid $150,000 based on inaccurate and incomplete information.

93.     And from a charging theory perspective, until the $150,000 in checks were paid out of the Travelers account, with authorization from Collura, and sent to Kontos and me, the insurance fraud was a *conspiracy to commit insurance fraud.*  Now that payments have been made, it's an insurance fraud.

94.     With respect to Scott, he's been with Travelers for more than 30 years.  By Scott's own admission at the Hearing, he's very experienced so he should have known to contact me after receiving the October 2, 2020 Letter.  But why didn't he?  Because it's possible that Kontos contacted Collura shortly after I fired Kontos on August 3 and then Collura contacted Scott to intervene in Travelers' outreach to me.  It's important to note that Scott threatened me in writing, via email and out of his Travelers' email account.  When I asked him at the Hearing who authorized him to do that, Scott said he couldn't recall.

95.     <u>Criminal Theory 2: Forgery, 18 U.S.C. Chapter 25, Counterfeiting and Forgery, generally, and 18 Pa. C.S.A. § 4101</u>: Forgery is established based on alterations of the Solicitation Documents after I sent them to Kontos on December 3, 2019.  I asked Kontos about the altered documents during the Deposition and his answers were unpersuasive.[153]  After that, the K&M Law Group uses the same legally

_____

[153]  Ex. pgs. 149, line 21-152, line 4.

invalid P.O.A. at issue in the Matter to execute settlement checks for deposit into the

Dollar Bank IOLTA account.  Kontos testified to this at the Deposition:

> "<u>Question</u>: Okay. How were you planning to obtain my signature on the check to deposit it into that account?"
>
> "<u>Answer</u>: Well, in accordance with our policy, we -- I would get the check, and I would send it to you and have you sign it, and then I would sign it.  Or there are instances where I would seek the authorization of a client to endorse their name; but I don't -- it just depends on the circumstances. The bottom line is that check would be deposited with both of our signatures affixed to it."[154]

96.    <u>Criminal Theory 3: Bank Fraud, 18 U.S.C. § 1344 and 18 Pa. C.S.A.,</u>

<u>Chapter 41, generally</u>: Bank fraud is established by any fraudulent representation made

to Dollar Bank in connection with any of the K&M Law Group accounts that are recorded

there.

97.    <u>Criminal Theory 4: Tax Fraud, 26 U.S.C. § 7201 and 61 Pa. C.S.A. §</u>

<u>119.22</u>: Currently, this theory is established through the referral fee payments by K&M

Law Group.  In the two checks that appear in the Exhibits, both are made payable to

individuals.  Check 16077 is made payable to "Eric Pfeil" and check number 16113 is

made payable to me, "Leslie Gitelman."[155]  On both checks, in the memo field, the

phrase "referral fee" appears.  A "fee" is a payment for services, in this case to a natural

person who performed a service for K&M Law Group, and by definition the fee is

taxable as income to the individual.

98.    As such, K&M Law Group would need to prepare and file the appropriate

information return reporting with the Internal Revenue Service.  However, in Pfeil's

---

[154]  Ex. pg. 47, lines 3-13.

[155]  Ex. pgs. 195 and 204.

case, he wrote in his cover letter to me that he "does not want to be taxed on the payment by cashing and remitting the funds to Leslie," suggesting that K&M Law Group may not report referral fee payments to the Internal Revenue Service.[156]  More generally, based on what's been revealed in the Matter and with the drafting of the payments for referral fees, it's reasonable to suspect that Kontos and Mengine may note be that concerned with tax reporting generally.  With the referral fee payments identified herein as a foundation, and based on Kontos's testimony in the Deposition Transcript, there are probably many other referral payments that have been made in other K&M Law Group matters.  And if those payments have been made, there are reporting obligations because all of them are payments for services, (i.e., fees) that should be treated as income to the recipients.  Whether the recipients report those fees paid to them as income is a matter for formal investigation.

99.    Criminal Theory 5: Mail and Wire Fraud, 18 U.S.C.§ 1341 and 18 U.S.C.§ 1343:  These fraud theories are present when the U.S. Mail or telecommunications services are used in the other criminal theories.  And again, based on Kontos's testimony and the aforementioned checks in this matter, every time a payment is mailed, mail fraud may be occurring.

100.    Criminal Theory 6: Attempt and Conspiracy, 18 U.S.C. § 1349 and 18 Pa. C.S.A. §901-903: Before Collura authorized the payments from Travelers to Kontos and me, these theories were probably best described as "facts that look like possible attempts and/or conspiracies."  Now that $150,000 has changed hands, in the form of

_____

[156]  Ex. pgs. 185 and 193.

the checks mailed to Kontos and me, and further substantiated by the drafting and mailing of the referral payments out of the K&M Law Group IOLTA account, these theories can be substantiated and coupled with proof of intent (e.g., the checks, email messages, and transmittal letters on letterhead, coupled with mailing envelopes and canceled U.S. postage stamps).  But absent that, these fact patterns appear to qualify as attempts and conspiracy.

## Conclusion

101.    In the final analysis of the Matter, as supported by the Deposition, Transcript, Order, Trial Court Record, Trial Court Opinion, and finally, the documented payment of referral fees, the facts in this Complaint appear to support the theory that Travelers and I were victims of a $150,000 Fraud Scheme.  The net result of which is that while I have received a $100,422.47 Settlement Check from Travelers, I haven't received the fair and full value of my Travelers Claim.  Apparent co-conspirators Kontos, Collura and Scott have been able to pull off the Fraud Scheme with the participation of Judge Della Vecchia and the Court.  And while the Matter is on Appeal in the Superior Court, because I never filed a counterclaim in the Matter, my rights under the M.V.F.R.L. to have my Travelers Claim fairly and fully valued have not been preserved. Now, with this Complaint and the Jurisdiction of this District Court provided by 28 U.S.C. § 1332, my rights can be preserved and my Travelers Claim can be fairly and fully valued up to the Total Coverages Limit provided by the Travelers Policy and the Geico Policy.  Finally, the facts in this Complaint and the six criminal theories identified herein appear suitable for a criminal referral to the United States Attorneys for the Western District of Pennsylvania and the Southern District of New York.

**WHEREFORE**, I, Plaintiff Leslie R. Gitelman, representing myself pro se, request this District Court to:

(i) accept this Complaint as properly filed and valid under 28 U.S.C. § 1332;

(ii) proper for adjudication and relief by the District Court;

(iii) permit me to present the facts and testimony necessary to value my Travelers Claim up to the limits identified in the Travelers Policy and the Geico Policy; and

(iv) enter an order against Travelers and Geico to compensate me for the serious bodily harm I received in the November 26, 2019 motor vehicle accident on Redfern Drive in Allegheny County, Pennsylvania.

Respectfully submitted,

Leslie R. Gitelman

Leslie R. Gitelman

## CERTIFICATE OF SERVICE

I, Leslie R. Gitelman, Esquire, do hereby certify a true and correct copy of the

within **COMPLAINT** and accompanying **EXHIBITS A-W** were served upon the following

on the _____ day of November, 2021 via United States Postal Service Priority Mail:

DEFENDANT 1
Ms. Dawne Wilkinson
1526 Redfern Drive
Pittsburgh, PA 15241

DEFENDANT 2
Mr. Alan D. Schnitzer
Chairman of the Board of Directors
and Chief Executive Officer
The Travelers Companies, Inc.
485 Lexington Avenue
New York, NY 10017

DEFENDANT 3
Mr. Todd Combs
President and CEO
Geico Casualty Company
5260 Western Avenue
Chevy Chase, MD 20815

with timely filing of a complete copy of the same in the District Court's Electronic Case

Filing ("E.C.F.") System.  These documents are available for viewing and downloading

from the Court's E.C.F. System.

**LESLIE R. GITELMAN**
**Pro Se Plaintiff**
2620 Quail Hill Drive
Pittsburgh, PA 15241
Telephone: 412-833-4924
Email: LRGITELMAN@AOL.COM
PA BAR ID: 61682, Status: Retired

58